The second and last case for the day is United States v. Wheeler, number 16-2780. I don't think you personally... I have a feeling we cleared the room. Good morning, your honors. May it please the court, my name is Renee Pietropalo. I represent the appellant, Willis Wheeler, in this case. With the court's permission, I'd like to request two minutes for rebuttal. I'm sorry, two? Two. That's great. It's our position that there are several reasons to vacate the judgment in this case, and I'd like to focus on two of them. First, the warrantless insertion of the keys into the locked apartment door. By physically intruding into a constitutionally protected area to obtain information, police committed a search which required a warrant or an exception, and here they had neither. It's for that reason that the evidence seized at Mills Avenue must be suppressed. I mean, didn't you fail to raise the sort of Jones-Jardine's Fourth Amendment argument for the district court? Your honor, actually, I believe that the issues were properly preserved, and I say that because we look at appendix pages 115 and 16, and in the motion of the hearing itself at 165 around there of the appendix. And Mr. Zimmerman, defense counsel at the time, he argued when officers put that key into the lock, that's a search. He argued it was a search, but the word trespass was never used, and the trespass theory of search was never used. It was always the reasonable expectation of privacy. Your honor, absolutely, Mr. Zimmerman did not use the word trespass. He never cited Jones, but he also never said the words reasonable expectation of privacy or pass, and the government agrees that was preserved. The reason it's preserved in this case I really think is articulated by Justice Kagan in her Jardine's concurrence. There she says, in physical intrusion into a constitutionally protected area is both a trespass and a violation of the reasonable expectation of privacy. And when we're dealing with the home, those two theories perfectly align. So our opinion is going to look the same. The only difference is an opinion under trespass is going to cite Jones, and an opinion under reasonable expectation of privacy is going to rely on Kylo, the 2001 case of the Supreme Court that really decided this issue under that rubric. And I would say looking at Jones really illustrates what the court was trying to get at, and looking at the facts of Joseph illustrates what the court was trying to get at in the waiver analysis. I think you said earlier in your brief that no one cited Jones, which was relatively new at the time to the district court. Yes, it was a case that actually had been decided at the time the warrant was executed, and Jardine's actually had already been decided at the time of the hearing. But in Joseph, the facts were quite different. You have a defendant in the district court saying there's no probable cause as to element X, and then on appeal he says there's no probable cause as to element Y. And the court says those claims depend on different facts and different law, and the problem with that is you're not giving the government an opportunity to present the right facts, and you're not giving the court an opportunity to pass on the right law or analyze the correct law. That's not what happened here. It's the same facts, and Justice Kagan recognizes it's really the same principles that are at play. So whether we address this under Jones' trespass or under reasonable expectation of privacy, the search was invalid at the time it was done, and the United States attorney who was giving the advice at that moment should have known it was wrong at that time under Kylo, if nothing else. But don't the courts of appeals who consider this, they're not exactly favorable to you, right? No, Your Honor, I think they are favorable. We have the First Circuit decision in Maine, and the court had no trouble deciding this under the trespass theory of Jones. Jardines does answer this question. There are really two district courts that say, or excuse me, circuit courts that say something different, and those cases, the Salgado and the Concepcion cases, came down pre-Kylo. So Kylo answers this question under the reasonable expectation of privacy rubric because in that case we have officers outside the home pointing the thermal imaging device at the home, and they're finding out information about what's happening within the home, just temperature there. And the court says, you know, under Kylo we draw a firm and bright line at the entrance of the home, and it doesn't matter that perhaps the information isn't intimate information. All information gleaned from within the home is intimate and protected because... Is the problem here that the key turned and they opened the door? Is the mere insertion of the key. The insertion of the key. So every person in that building who had an apartment, because they tried the key in several doors as I understand it, would have a Fourth Amendment claim, is that what you're saying? They did two key searches that mattered to my client, right? They did the insertion... I'm talking about other people now as well. Sure. Is that a violation of their rights as well? You take that key, you insert it, you try to turn it, and it doesn't turn. It wouldn't matter in those cases because they're not obtaining information. So it's a physical intrusion to gain information to build a case against someone. So while that's a trespass, it wouldn't be an actionable trespass as to those people who the apartment door didn't open with that key. So it's not the insertion of the key, it's the fact the key turns. That's what makes the difference? It's a trespass when they insert the key, but the Fourth Amendment protects the gaining of information through that trespass. So that's what it's getting at. And that's why Mr. Wheeler can assert the protections of the Fourth Amendment under whatever rubric this Court applies, but I submit under both trespass theory and under reasonable expectation of privacy theory. What about the standing issue? The district court said not convinced that the defendant carried his burden of showing standing. We know the apartment didn't have a written lease. I think we know that. It wasn't all clear to me what was and was not in the record. We know that he had a utility bill in his car that didn't have his name on it, but was the address of the apartment. Right. We know that it didn't appear to have any of his personal possessions in the apartment. We don't actually know that, but... I think I saw something about how there were women's clothes. Women's clothing, yes. The standing stems from Mr. Wheeler's... The accepted testimony was Mr. Wheeler and an unidentified person went to the landlord and actually rented the apartment, so he's the lessee. Was that stipulated? Because Mr. Wheeler never testified. No, it was if... This was at the hearing on the motion, and it was if called, this is the testimony that the landlord would offer. So it was a proffer that was accepted by the district court, and those facts would... Assuming standing, then she reached the issue. But there is standing when he's the lessee, and he's not just the lessee of the apartment. He has actual access. We know he has access because he has the key. We've seen him go into the apartment. He doesn't just go in apparently at will. He actually removed trash from the apartment. So the cases that I've seen where a lessee might lose his standing are quite different. You're the lessee, but you stop paying rent. You're the lessee, but you have no ability to actually access the property. That's not what we have in this case. So do we know who paid for anything? We know that rent was left in the apartment, but we don't know who paid the rent. The evidence of that, it wasn't necessary to put it on because the court kind of just assumed standing, then let's reach the issue. If this court's concerned about that, that might be a proper basis to remit and actually develop the record on that issue. But really, the idea that Mr. Wheeler paid the rent was an accepted principle. There was evidence that he's paying the electric bills in the home. So he has standing, and yet you argue that he had no control over the contents of the apartment. It's not so much control. It's was he in constructive possession of the stuff that wasn't in plain view. It was in a bedroom closet in a locked safe that he didn't have a key to. I'm sorry, there's no evidence in the record of the key. You said he didn't have the key to it. Isn't that a little different than the evidence is the police didn't find a key? I may have misspoke, but the evidence is the police searched his car, searched his person, and searched his home, and they never found a key to the safe. So if I misspoke, I apologize. It's really technical, but they searched all those things, but does the record reflect they were searching for a key, or they just simply did searches, but when they got to opening the safe, they didn't have a key? It's not the same as saying Mr. Wheeler didn't have a key. They were searching for effects. They did search the home, it seems, pretty exhaustively. They had a pretty thorough warrant. I can't say whether they were specifically looking for a key or not, but the apartment keys that are seized from the car, they're saying that's an effect and we're looking for that kind of thing. So I really can't answer your question probably in the way that you'd like me to, Your Honor, but the evidence, and that's really a minor point, actually, the key to the safe. The more important part is that this entry was made without a warrant and without an exception, and information gleaned from that entry was used to secure a warrant, and so the warrant became actually fruits of the bad search, and that's why suppression is required. What about the issue with the mannitol, the heroin and the mannitol? I think it's an interesting issue in the case how Rossi, the DEA technician, I guess at first didn't testify that there was mannitol as one of the elements. Then with new government Exhibit 21A, she said, oh yeah, I adopt this, and it had mannitol on there. I think that she was asked, do you agree this reflects your testimony, and she said yes, but it didn't reflect her testimony, and there was an objection to it. But at that point, didn't it reflect her testimony? It absolutely did not. The prosecutor methodically walked this expert through every piece of heroin that was seized, and she methodically detailed which diluent was in each piece of heroin. Okay, and I read the record, but there was no objection to 21A, and there was also no cross-examination as to this new sort of development. Right, because the evidence is the testimony, not a summary chart, and the jury's instructed, you don't rely on a summary chart, you rely on the testimony and the evidence. And so, defense counsel objected to this chart that didn't reflect the evidence that came in, and the court let them both in for record development, and that's- So it's ineffective for saying, oh yes, this is right, this chart, the elements, all the evidence on this chart is what I say. But that's not actually what she said, from my memory, Your Honor. She showed the chart and said, does this reflect your testimony? And she just says, yes. But it didn't reflect her testimony, and there was an objection to that fact. If she had said, oh, on this chart there's mannitol, I forgot to tell you, there was mannitol, I found it in certain substances, maybe I could agree with that premise, Your Honor. But that's not what happened at all here. The government explicitly makes the argument that the new chart, with her adoption of it as accurate, says, well, this, of course, explains why Bush didn't want any mannitol to be added because it was already in there. That's so speculative. There's nothing in the record to support that. We have his, excuse me, Mr. Bush's explicit statement on a taped call saying, I refuse to use mannitol because it messes up my recipe. So the idea that he somehow was okay with a little bit, it's really not borne out by the record at all, Your Honor. If I could turn to the lay opinion just for one minute. Sure, we'll give you an extra minute. So the lay opinion testimony, I won't belabor the issue. I think Fulton and Jackson talk about the helpfulness requirement, but there's another missing piece to the puzzle in this case, and it's that Officer Barrett who testified had no first-hand knowledge. 701 requires first-hand knowledge. This Court in Knight said an officer who testifies who's not an eyewitness doesn't have first-hand knowledge.  There have been D.C. circuits that all say an officer doesn't gain first-hand knowledge simply by reviewing this. The government doesn't seem to disagree with you about the law. The government says that the lay opinions were elicited primarily by the defense and then followed up on redirect, and that you can't exactly be here saying he shouldn't have been allowed to say that if the question was actually asked by the defense. The government didn't have any obligation to object to what might have been testimony that was beyond the scope of what a lay opinion could be. Yes, and I disagree with that reading of the record, of course. Defense counsel pre-trial filed a motion specifically asking for limitations on this testimony. She repeatedly objected to the offering of lay opinion. She even went so far as to ask for an instruction that the jury be told if lay opinion comes in and it's not based on first-hand knowledge, you shouldn't rely on it. The judge overruled her objections at every turn to accept the government's position that if you somehow open the door to this evidence that already came in, it would really tie counsel's hands. It's like she would have to forfeit her right to cross-examine this witness simply because she objected to him offering opinion. Ms. Cohen asked fact questions of these witnesses, and then they chose to, because the court allowed it, offer opinion testimony. She presented facts, for example, the actual words used in the phone calls, and said, isn't this what was said? And that lay witness, Mr. Barrett, or Officer Barrett, would say, that's what it sounds like because those are the words actually used. But that's not what he meant. He meant something very different. If that was his answer, didn't she have to move to strike the nonresponsive portion in order to preserve it for appeal? She repeatedly, throughout, objected, moved to strike. At a certain point, I think that your objections become futile. The court made it clear from the opening. This witness was called to the stand five times, and the court made it clear from the very beginning that he was going to be allowed to offer opinion testimony. She really had already made this ruling in the first trial with the co-defendants. There was no way to really get her to change that ruling in the second trial. And notwithstanding his very clear objections on the basis of 701, 702, hearsay, no first-hand knowledge, I don't know what else she could have done to preserve her objections in this case that wasn't done. All right, counsel, thank you. We'll move on. May it please the court, Donovan Cocas on behalf of the United States. I'll start with the suppression issue, go to the 701, and then hopefully wrap this up with a sufficiency discussion because it then hits everything that I'm not going to be able to discuss. And then if you want, I can explain to you what exactly happened with the Manitoult. Let's start with that. Okay. So the Manitoult, if you'll notice, DA-21 was the same chart we used in the Bush-Mischer trial before. When I came on this case, I looked at it, I thought, well, is there more information we can put in in the Wheeler trial? And sure enough, we could add all the additives that were included in Bush's heroin, Wheeler's heroin. So I created DA-21A. They're both produced to the defendant. But then when I get up to examining the witness, somehow DA-21A didn't make it into our PowerPoint. So I'm examining her with 21, not realizing it. And then when I do realize it, I switch to 21A. Did counsel have 21A? They had them both. And when I get to the end of it, what counsel does, and this is actually kind of clever, he says, well, that doesn't reflect the testimony. It's unclear what that means. It's unclear what testimony he thinks is not in it. And if I had it to do over again, I would have asked for a sidebar and forced him to say she didn't testify about Manitou. But he doesn't want to mention that because he knows she's still on the stand. I can just ask her that. So he makes this big objection. Why don't you just ask her specifically? Because I didn't realize, because I had switched charts midstream, I didn't realize I hadn't specifically hit the Manitou. But he knows I don't realize it, so he's not saying you didn't ask about the Manitou. So the court and I don't know what to do. But finally we figure out which chart he's objecting to at least. And she says, well, if you can have her look at it and confirm it reflects her testimony. So I do. She spends a couple minutes comparing it to her lab reports. And I went over this in closing. Nobody objected to my characterization of it. And she says yes. He doesn't renew his objection. And the court says, well, you can cross-examine her if you don't think it reflects her testimony. He doesn't. Because, again, he knows if he does, she's going to say Manitou. And it doesn't matter because the Manitou is not a signature ingredient, our expert so testified. It's really the purity of the heroin, the de-escalation from Wheeler's to Bush's to the street level heroin. That's the problem for him. What about the testimony that Manitou is going to mess up my recipe? Well, and so I argued this two different ways. In closing, I actually said by closing I realized what was not elicited was the specific yes, Manitou is in there. So I said to the jury, suppose you just go from DEA 21. The explanation for that chart, which, while correct, was incomplete, could be that Bush thought it was sort of over-editing the pudding. In other words, Bush may not have wanted to add extra Manitou because he knew Wheeler's heroin already had some. And Bush was finicky about his recipe. We knew that. Let's see. The suppression issue. So in the Joseph opinion, this court stated that suppression issues have to be raised with exacting specificity, meaning the identical argument must be raised in the district court as here. Well, and Joseph goes on to say, page 342, that identical arguments will always have two common features. They'll be based on the same factual predicate and the same legal rule. Well, he raised the same factual predicate here. He does say turning the key in the lock is a search. And he said that eventually in the district court. But in the district court, he only proceeded on a rapist, Olson, reasonable expectation of privacy theory. As he admits at page 73 of his opening brief, that's a distinct fork in the road from the Jones-Jardines trespass theory. Jones-Jardines was available to him by the time he moves to suppress in 2014 and when he moves for reconsideration in 2015. And remember, now it's a narrower standard review because they've got to cite new facts and new law. The district court says, you haven't shown me new law that changes my mind. They simply missed Jones-Jardines, and because of that, that issue is waived here. Now, the rageous issue theoretically could have been preserved here, but the problem is in his opening brief. And again, you look at page 73 and a couple of pages leading up to it. He talks about the reasonable expectation of privacy, but at page 73, he says, I'm riding one horse, and that horse is named Jones-Jardines. He tries to rectify that in his reply brief, but as we know from the Cruz case that I cited in my response brief, that's too late. So, bottom line is, the Jones-Jardines issue is waived because they didn't raise it below, and the rageous Olson issue is waived because he didn't try to raise it until his reply brief. Suppose you get past the double waiver, we have the standing argument. Now, I caution that the Supreme Court will be reconsidering standing in the Burr case that it's hearing. That involves a borrowed rental car, so suppose we put a pin in that. Assume for the sake of argument, Wheeler has standing. I'm not conceding it, but assume it. Then the problem that he runs into is on the merits, because the stipulated fact presentation at the suppression hearing, and he waived an evidentiary hearing, so it's too late for him to say, I want another one, I think. The stipulated facts were these, essentially. He stipulated he and another man appeared at the time the apartment was rented. Unclear who rented it. Unclear who paid the rent. There is no lease. So, as you keep calling him a leaseholder, there's no lease. Second, the utilities were all in other people's names, not Willis Wheeler's. And third, Wheeler had a set of keys, we don't even know if that's the only one. Now, notice what's absent from that. There's no stipulation, no evidence that this was his home, that he even spent the night there. And that's, which he has called this a home about ten times during the opening presentation. This is, I don't know whose home this is, but it wasn't his. He lives in, rented in a house. Plus, wasn't the apartment rather sparsely furnished and all? Yeah, there's no bed in there. There's a sofa, a TV, I think, but no bed. So, the bottom line is, what I just described to you is essentially a glorified storage unit. In other words, for four amendment purposes, and it's an effect. An effect under the Jacobson decision, 1984, I think, still good law. Effects are subject to the de minimis exception. So, that's why the Lyons case, first circuit, cited in my brief, involved the turning of a key in a padlock, I think is the after decision than the later Bain decision, because in Bain, the defendant had filed an affidavit saying, I spent the night at this apartment that had been searched. We don't have anything like that here. If you get past all that, you get past the notable discovery doctrine, which we've invoked, you still have the good faith exception. And I've alleged it on two fronts. One is that AUSA Conway apparently advised on March 14th, 2012, the day all this is going down, officers doing all the various searches, he does quick and dirty research on Westlaw, he doesn't find anything saying this is impermissible. He still says you can test the locks, but don't search any place that opens. They relied on that reasonably, and they relied on the warrant reasonably. Now, in his overlinked 28-J letter, Mr. Wheeler claims that I waived the argument that officers relied on good faith on the warrant by not briefing it in my response brief. And my answer to that is this. In my response brief, I specifically cite Lyons numerous times.  I explain how the warrant was obtained, and I even invoke, I'm going to quote myself, Lyons' good faith exception in my discussion of good faith. If all of that is waiver, then I submit to you we're now in a logic loop, because you don't even get to my waiver because he's waived the underlying issues by never citing Jones, Jardines, or trespassing the district court, by not relying on a reasonable expectation of privacy in his open brief. So that's what we've done with that. Can I move on to, your theory was that Wheeler is the supplier. Yes. Does he have to have been the supplier to affirm here? I mean, what's the specific evidence of him being the supplier besides he possesses some pure evidence? Sure. So some of it requires inferences, but we're entitled to those. Yeah. So, you know, he's referred to as the man, the guy, the dude, and virtually everybody else. That's an interesting thing. Where in the record was he actually referred to as this person? It's just an inference. It's an inference, but not just an inference, John. Here's what it's based on, a couple of things. There's an early call where Bush tells Mishra, well, my man called me and told me he saw your place was raided on TV. Inferences from that, two inferences at least. One is whoever his man is is someone local, someone in Detroit that's not watching Pittsburgh television, seeing about the rate of a little head shop. And whoever it is is interested in the heroin trade. Well, that eliminates the only two other candidates for man they offered because Dean Floyd is in Detroit. And Damon Boyd, while he's local, is strictly a cocaine dealer. In fact, I handled the Dean, I'm sorry, the Damon Boyd appeal a few years back. You can see it. But it's in the record for both of those facts. So there's that. There's the fact that Wheeler is the most important person in Bush's life. And this is a big fact, that Wheeler is the one that we see on an almost daily basis at Bush's house on the poll camera from mid-January 2012 to mid-March 2012. In his response, he suggests, insinuates that we only saw Wheeler there for a day or two before. I didn't know he was going to assert that in his reply. So I'd like to file this thumb drive containing all the poll camera footage because that's really the evidence that sunk him in this case. Is that a part of the record in this report? It is a part of the record. Well, we'll hear from you, obviously, whether they object to that or not. Yeah, yeah. But there's like, you know, that on an almost daily basis shows Mr. Wheeler coming to me. How much are you going to be giving us? Are we going to be spending the whole day watching poll cameras? No, no, no. It's just snippets. It's not you sitting there and you're watching. I think the camera snippets that we have are just when Wheeler arrives, Wheeler leaves. Wheeler arrives, Wheeler leaves. Okay. Each one's a few seconds. That's good to know because we can't watch 24-7 poll footage. It's too boring. As much fun as that would be, right? The fifth or sixth clip in it is illuminating because you can see Mr. Wheeler leaving Bush's house with an opaque bag and inside you can see different colored bundles of something. So I would have filed it had I known he would deny what it shows. So you have that. And then to me the most damning cause and one he doesn't object to, which is Sylvia Bush to Richard Bush, Willis is in the basement. The only thing, the basement is the heroin lab. That's it. And she's calling Bush, therefore he's not at home. And Bush's relatively laconic reaction is not what you would expect if this had been a heroin dealing competitor. This is a co-conspirator, clearly. 701 testimony. I can address it. Two important things to note. In response to your comment, Judge Bolton, I do disagree a little bit with the defendant's statement of the law in that he seems to think under 701A personal knowledge means percipient eyes-on knowledge of every event. In his courts, Giorgio and Anderskow cases, it said the 701 witness can testify based on reports he read, other people prepared, evidence other people seized. In our record from pages 522 to about 538, you can see we developed the foundation. Detective Barrett made the controlled lies. He listened to the calls. He reviewed the evidences. So that's not a problem. I think the thrust of his argument is in 701B, the helpfulness to the jury, and about 80% of that I think pertains to this Dean Floyd, Damon Boyd issue. I don't know if it's clear from the brief, so I want you guys to know how this developed. Before trial, apparently Mr. Wheeler decides he's going to claim that someone else, not him, was Bush's heroin supplier. But he has a problem in that he doesn't have any witnesses who will testify to that. The documents that he wants to offer have been ruled to be hearsay. So what he tried to do was take, I think, the dangerous gambit of turning our 701 witness into his witness by asking him, well, don't you think Dean Floyd or Damon Boyd might have been the source? Our witness says no. So instead of stopping there, they began reading into the record a document that the court ruled was hearsay. This all happens at pages like 568 to 84. He still says, no, I don't think these guys were the heroin source. When that happens on redirect, I think we're entitled then to ask him why he doesn't think so. If they've conceded that it's helpful to the jury for him to opine whether one of these guys was the heroin source, then I think they've tacitly conceded anyway that the why is important. So that's the issue there. Same thing with the joints. It's clearly a code word. I know I had the expert attest to it a little bit, but both experts and 701 witnesses can testify to it. So I guess it's sufficient the argument, and this I think encompasses everything else I won't be able to discuss. Mr. Wheeler rightly points out that we don't have a whole lot of phone calls involving him than anybody or substantive text. Our theory was that's because he's on supervised release. He has to be more careful than Bush and Mishra, who weren't, and were freer on the phones. But what we do have is that poll camera footage on an almost daily basis showing this pattern of behavior, and it would be text message, where are you at? Response, on my way. Wheeler comes, takes a while. Is the fact that he was on supervised release a part of the record? Is it part of the record? I don't think the jury knows it. So when I say that part of our theory was that he was on supervised release, I think all we said to the jury was that he was extra careful. We didn't say the why. Okay. So he takes longer than he should to get to Bush's house, and when he gets there, and this is interesting, he parks his car in George's, George Bush. Classified. In George Bush's car door, gets out, and he activates a mechanism inside his car door that opens Bush's garage. That's at page 861. Goes in, sometimes carrying bags, stays for a period of time. And what the poll camera footage will show you is the layout of this house. Basically, the basement and the garage, it's built into a site of a hillock. The basement and the garage are the bottom floor, and then the house sits above it. And you can't get into the house without going through the heroin lab. So he stays there eight hours, leaves. And this pattern is sort of recursive until, you know, March 13th, same thing. He stays there eight hours, and then on the morning of the takedown, we, you know, catch him on my way. He comes. We catch him with about 144 grand of 86 percent pure heroin in the car, which happens to be double the purity of Bush's unbagged heroin and about four times the purity of Bush's bagged heroin. So that, I think, is what sinks him. You know, and notice now all the evidence I haven't even mentioned. So I haven't mentioned the call, the joints calls, the taken-as-trip text, you know, the evidence seized from the mistress' house, even the stuff seized from the stash house. That's because all of that was window dressing to what was largely a behavioral case that was built on this poll camera footage and the influence you draw from 144 grand worth of 86 percent pure heroin in his car on the morning of the arrest. If the court has no other questions. Okay. Thank you, counsel. Thank you. I guess the first thing is, do you have any problem with him lodging this exhibit from trial? I do. Part of the record, right? I actually don't know that, Your Honor. I know there was some poll camera footage in it. I don't know what Mr. Could you work that out with counsel? And I assume if it's part of the record, we're entitled to look at it. If it's not, obviously we're not going to consider it. But maybe you could work that out with counsel. Sure. And I'm not going to go point, point, point and attempt to refute Mr. Kokas' characterization. We've got a lot of briefing here. I think I can rely on the briefing for that. With the Manitou, a quick point. It's the evidence. The testimony is what's the evidence, not a summary exhibit. The law is very clear on summary exhibits are not evidence and the jury is so instructed. The United States Attorney's characterization in his closing of that exhibit is also not evidence. He explains right now that he realized his mistake during closing and tried to fix it. But, again, it's the testimony of the expert. That's the evidence. The only question that was asked of Ms. Rothi was, does this new exhibit generally reflect or summarize your conclusions? And she says yes. I mean, that's not enough. Turning to waiver. With all the evidence, the jury may not have considered that to be that significant. Again, it all actually dovetails into why the lay and expert, the impermissible lay and expert testimony was so important and so damaging in this case. That was objectionable testimony. Even if we totally ignore the Dean Floyd aspect of it and just look at the taken-trip text and the joints call, that was the centerpiece of the government's case. This case was an entirely circumstantial case. And the government needed the jury to draw certain inferences. The problem is they're using lay and expert opinion, improperly given opinion, to draw the inferences that it wants. Defense counsel offered other inferences. But what about, I mean, couldn't the jury have taken the evidence of, here's a guy that's arrested with a whole lot of really pure heroin, who we know that for the past two-and-a-half months has spent many, many days in a heroin lab. Thirteen days. That's a lot of days in a heroin lab. And the heroin lab, we know, has a whole bunch of heroin in it that's not packaged. And it has thousands of little baggies of packaged heroin and say, oh, my gosh, he obviously was helping Mr. Bush package. They draw the inference that he was down there working with Bush to cut the heroin and to put it in the little stamp bags. And therefore, he's a conspirator. It's entirely possible he was a conspirator. But a conspirator as to what? As to the charged conspiracy or as to something else? So that's why the mannitol matters. That's why the lay opinion matters. Defense counsel offered alternative interpretations of this evidence. She's saying there are no brown stamp bags in Mr. Bush's house. And the government says, look at this reference to brown. It must mean they're working together. The government relies on Warfield's testimony. If he said brown and it's the same evidence, it's the same color Bush house and it's not, that means they're working together. This taking a trip text means they're working together. Take care of business. Be safe. Don't get caught because if you get caught, that means I get caught. Those are all the inferences and opinions that Warfield and Barrett improperly offered. The evidence is Mr. Wheeler is clearly stopped with a large quantity of cocaine. I'm sorry, heroin. We don't know that that heroin was intended for Bush because it has the different dilutant and also the theory of the government is he's on his way to cut, step on that heroin. Mr. Bush didn't have enough dilutant on hand to cut this new heroin that's vacuum packed so it's packaged and cut differently than all the heroin in Bush's house. So we know that. They're saying he's on his way to immediately start this process of cutting heroin. But when the police enter, nothing is out in the open. It doesn't look like a heroin lab. There's a table that has residue on it and there's one chair there and there's cut straws. But everything else is really tucked away and hidden. There's bags and bags of these sleeves, they call them. A lot of them are in an abandoned car. I won't say abandoned, but a car that doesn't work that's in the garage. A lot of them are under steps. There's stuff that's in bags that are closed. So it's not like you're going to walk in and say, oh, this is a heroin lab. I automatically know what's happening here. But even if, again, Mr. Wailer... It was a heroin lab. It was a heroin lab. We know it was a heroin lab. We know, but the point is they're relying on inferences that he was in the lab so he's doing this. He's present so he's involved in this. But the question for the jury was, what exactly was he a party to? Was he this giant conspiracy that lasted for more than a year to distribute more than a kilo of cocaine in the East Hills? Or was he part of some different conspiracy? All those bags that were in and all that dilutant that was in Bush's possession? The theory is Bush is involved in a different conspiracy with Mishra to distribute dilutant around the city of Pittsburgh and Michigan and New Jersey. What's Mr. Wailer really involved in? And that's why the lay opinion matters. The multiple conspiracy instruction that was denied matters. That's why we have an argument maybe he's guilty of less than a kilo and it's a 10-year and not a 20-year maximum. That's all covered well in your brief. Your time's up, so thank you, counsel. Thank you, your honor. And we'll take the case under review.